T.C. Memo. 2016-218

UNITED STATES TAX COURT

AJIBOLA O. IBIDUNNI, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4226-15.                          Filed December 1, 2016.

Ajibola O. Ibidunni, pro se.

Michael T. Garrett, Matthew A. Houtsma, and Gretchen W. Altenburger, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent determined the following deficiencies and penalties with respect to petitioner's 2010 and 2011 tax years:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2010 | $43,093 | $8,619 |

| 2011 | 22,296 | 4,459 |

[*2] The issues for decision are: (1) whether petitioner underreported income from each of four enterprises he owned and operated during 2010 and 2011; (2) whether petitioner is entitled to deductions for business expenses in amounts exceeding those the Internal Revenue Service (IRS) allowed for 2010 and 2011; (3) whether petitioner underreported nonbusiness income during 2010 and 2011; (4) whether petitioner is entitled to deduct a capital loss that was not reported on his 2010 tax return; and (5) whether petitioner is liable for a section 6662(a) accuracy-related penalty for either year.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner resided in Colorado at the time he filed his petition. The record in this case, in large part, is confusing because of petitioner's failure to maintain adequate books

and records for his business activities. Nonetheless, we have done our best to reach factual conclusions based on the evidence presented.

[*3] Petitioner holds a Ph.D. in materials science. After graduating from Ohio State University, petitioner worked for an engineering consulting firm in Ohio and then for Bell Labs, where he conducted research. Petitioner was awarded several patents. He earned a comfortable salary which enabled him to accumulate some measure of wealth. Petitioner and his family (his wife, two daughters, and a son) moved in 1994 to Boulder, Colorado, where petitioner joined a startup firm that manufactured inner-level microelectronics packaging. Petitioner and his wife purchased a ranch-style house in Boulder in 1994 for $298,000, of which $175,000 was the value of the land.

Petitioner's personality did not fit the culture at the startup company, and he was asked to leave. After briefly working for another company, petitioner struck out on his own and established several businesses. During the years at issue, petitioner owned and operated four businesses: (1) All Boards Sports, which operated a retail store that sold snowboards, skateboards, and sports accessories; (2) B&E Enterprises, which rented petitioner's Boulder house on a short-term basis to vacationers and other interested parties (petitioner lived in a "mother-in-law" apartment on the property); (3) Materials Consultants Associates, through

which petitioner provided engineering consulting services; and (4) Crossroads [*4]Wellness, LLC, a medical marijuana dispensary and wellness center, which petitioner owned and operated during the first half of 2010.

During the years at issue, petitioner maintained multiple banking and investment accounts, as follows:

(1)    Advantage Bank account with number ending in 4761; this account was held in the name of Materials Consultants Associates.

(2)    Advantage Bank account with number ending in 2887; this was a savings account which petitioner used as an operating account for All Boards Sports.

(3)    Advantage Bank account with number ending in 7927; this was another operating account for All Boards Sports in which petitioner deposited merchant card payments other than American Express.

(4)    Advantage Bank account with number ending in 5288; this was another account opened for All Boards Sports.

(5)    Advantage Bank account with number ending in 2682; this was petitioner's personal checking account in which he deposited payments received by B&E Enterprises for the rental of his house.

[*5]  (6)  Advantage Bank account with number ending in 1096; this was another of petitioner's personal accounts in which there was minimal activity.

(7)  Advantage Bank account with number ending in 5296; this was a dormant bank account.

(8)  U.S. Bank account with number ending in 9251; this was another of petitioner's personal accounts.

(9)  Charles Schwab investment/checking account with number ending in 2451; this was petitioner's personal investment account.

(10)  Charles Schwab SEP IRA account with number ending in 2458; this was petitioner's IRA account.

(11)  Charles Schwab account with number ending in 1567; this account was opened on December 20, 2011, with a $2,711 deposit.

(12)  Charles Schwab account with number ending in 1961; this account was opened on December 29, 2011, with a $2,700 deposit.

(13)  Wells Fargo account with number ending in 5396; this account was opened on January 4, 2010, as the operating account for Crossroads Wellness Center, LLC, and was transferred to the new owners when Crossroads Wellness Center, LLC, was sold in 2010.

[*6]   Petitioner himself prepared Forms 1040, U.S. Individual Income Tax Return, for 2010 and 2011.  Schedules C, Profit or Loss From Business, for petitioner's four businesses were attached to each year's Form 1040.  The IRS selected petitioner's 2011 tax return as part of its National Research Program; Revenue Agent Mana Anderson was assigned to conduct the audit.  The audit was expanded to include petitioner's tax return for 2010 after Revenue Agent Anderson's initial review indicated that petitioner had underreported his income and overstated his expenses for 2011.  Ultimately, Revenue Agent Anderson determined that for each of his four businesses petitioner had underreported the business' income and was not entitled to deduct expenses in the amounts claimed.  In addition, as part of the audit Revenue Agent Anderson identified unreported nonbusiness income petitioner received during the years at issue.  The IRS also determined accuracy-related penalties under section 6662(a) in the notice of deficiency.  At trial petitioner asserted he incurred a $50,000 capital loss which was not reported on his 2010 tax return.  We hereafter discuss the IRS' adjustments and petitioner's capital loss assertion in turn.

1.   All Boards Sports

    Upon moving to Colorado, petitioner became an avid snowboarder.  He began manufacturing and testing snowboards of his own design.  Petitioner turned

[*7] his passion for snowboarding into a business, founding All Boards Sports (ABS). ABS rented retail space at Crossroads East, a strip mall in Boulder, Colorado. ABS also sold snowboards, via the Internet, using PayPal for payment services.

In 2010 petitioner reported on ABS' Schedule C gross receipts of $169,454, cost of goods sold of $108,306, and gross income of $61,148. After deducting expenses totaling $85,409, ABS' Schedule C reported a net loss of $24,261 for 2010. In 2011 petitioner reported on ABS' Schedule C gross receipts of $217,366, cost of goods sold of $143,905, and gross income of $73,461. After deducting expenses totaling $86,193, ABS' Schedule C reported a net loss of $12,732 for 2011.

Revenue Agent Anderson began her audit by interviewing petitioner at ABS' store. Following a tour of the store, she reviewed ABS' bank statements and computer records. Petitioner used QuickBooks to report ABS' income and expenses. Revenue Agent Anderson determined ABS' business records were incomplete. She noted that although the Schedule C for ABS reported ABS' income employing the cash method of accounting, the QuickBooks records employed the accrual method of accounting. Moreover, Revenue Agent Anderson was unable to reconcile the QuickBooks records with petitioner's bank statements.

[*8] Consequently, Revenue Agent Anderson concluded she had to reconstruct ABS' income using the bank deposits method. To do so, she summoned ABS' bank and PayPal account records.

Revenue Agent Anderson examined ABS' banking activity for each month of 2010 and 2011. She totaled all deposits made into ABS' bank accounts with Advantage Bank[1] and then added payments received through ABS' PayPal account. Revenue Agent Anderson reduced this sum by all identifiable nontaxable deposits, such as returned checks and interaccount transfers, to determine taxable deposits. She then reduced the taxable deposits by identifiable payments of State and city sales taxes (petitioner did not claim sales taxes as Schedule C expenses). After completing her calculations, Revenue Agent Anderson spoke with petitioner and where necessary modified her calculations according to petitioner's explanations. Upon completion of her examination, Revenue Agent Anderson determined that ABS' 2010 gross receipts were understated by $26,580 by comparing the taxable deposits calculated with the amount of ABS' gross receipts reflected on Schedule C of petitioner's tax return. Using the same

---

[1]It appears that only two of ABS' bank accounts (account numbers ending in 2887 and 7927) were active. ABS' account number ending in 5288 had total deposits of only $100 in 2011.

[*9] methodology, she determined that ABS' 2011 gross receipts were understated by $29,370.[2]

Revenue Agent Anderson also determined that the deductions claimed on ABS' Schedule C for 2010 should be disallowed, in whole or in part, except for $50 for commissions/fees, on the basis of failure to substantiate. Revenue Agent Anderson further determined that certain deductions claimed on ABS' Schedule C for 2011 should be disallowed in whole or in part. The following tables show expense deductions petitioner claimed and the amounts respondent allowed upon completion of the audit for the years at issue:

| 2010 Expenses | Amount deducted on return | Amount allowed |
|---|---|---|
| Advertising | $1,421 | $976 |
| Car & truck | 4,860 | -0- |
| Commissions/fees | 50 | No adjustment |
| Contract labor | 3,354 | 1,640 |
| Depreciation | 2,425 | -0- |
| Insurance | 2,369 | 2,046 |
| Interest | 4,101 | -0- |
| Legal & prof'l servs. | 2,248 | -0- |

[2]In the notice of deficiency, respondent determined that ABS' 2011 gross receipts were underreported by $26,016. However, in preparing for trial, Revenue Agent Anderson discovered an error she made in her 2011 bank deposit analysis. Initially, she calculated $107,658 as the total taxable deposits. She subsequently calculated the correct figure to be $111,011. Thus, respondent now seeks to increase the total amount of ABS' 2011 unreported gross receipts by $3,354, leaving $29,370 as the amount of ABS' underreported gross receipts.

[*10] Rent ........................... 24,600 ........................... 17,787
Repairs ........................... 3,805 ........................... 1,000
Supplies ........................... 5,973 ........................... -0-
Taxes/licenses ........................... 1,791 ........................... -0-
Travel ........................... 77 ........................... -0-
Meals/entertainment ........................... 839 ........................... -0-
Utilities ........................... 7,999 ........................... -0-
Other ........................... 19,497 ........................... 11,174

| 2011 Expenses | Amount deducted on return | Amount allowed |
| --- | --- | --- |
| Advertising | $4,949 | No adjustment |
| Car & truck | 8,635 | -0- |
| Contract labor | 1,352 | $1,292 |
| Depreciation | 1,490 | -0- |
| Insurance | 1,248 | No adjustment |
| Interest | 3,321 | -0- |
| Legal & prof'l servs. | 3,327 | -0- |
| Rent | 18,000 | 16,830 |
| Repairs | 6,742 | 1,974 |
| Supplies | 4,737 | -0- |
| Taxes/licenses | 514 | -0- |
| Meals/entertainment | 53 | -0- |
| Utilities | 6,761 | -0- |
| Other | 25,064 | 23,530 |

At trial petitioner presented substantiation for some of the reported expenses.

Because of evidence presented at trial, respondent concedes that petitioner is

entitled to the following revised expense deductions:

| [*11]      2010 Expenses | Revised amount allowed |
|---|---|
| Supplies | $171 |

| 2011 Expenses | Revised amount allowed |
|---|---|
| Supplies | $234 |
| Taxes/licenses | 109 |
| Utilities | 1,350 |

2.    B&E Enterprises

As mentioned supra, petitioner and his wife purchased a ranch-style house in Boulder, Colorado, in 1994 for $298,000.  They remodeled the house extensively beginning in 1995.  The house was built to an open floor plan with hallways along the perimeter of the building, which allowed one to see into the basement level.  The house had seven bedrooms:  a master bedroom suite and two bedrooms on the main level and an additional four bedrooms on the basement level.  A four-car garage was added, and the original garage, which is behind the house, was converted into a self-contained "mother-in-law" apartment.  The house also included a den, a "potter room", a loft above the garage that could be used as an additional bedroom, and a shed in the backyard.

Over time, petitioner and his wife drew apart, and in April 2010 they divorced.  Petitioner has been living in the house's mother-in-law apartment since 2009.  After the divorce petitioner's former wife left the home although she

[*12] retained her ownership interest. Petitioner continued to live in the mother-in-law apartment. The only resident of the main house was petitioner's daughter, who continued living in her bedroom from January through June of 2010. The daughter did not pay rent.

The parties agree that petitioner's basis in the house (including improvements and the land value) was $771,725 at the end of 2010. Petitioner considered selling the house, but the housing market of 2010 made that option a nonstarter.

With no other use for the house, petitioner established B&E Enterprises to rent it out short term to vacationers and other interested parties. At some time in 2010 petitioner began renting out the house. Many of the renters were visiting the area to attend functions at the University of Colorado.[3] Petitioner did not use written rental agreements.

In 2010 petitioner reported $8,450 in gross income on B&E Enterprises' Schedule C. He reported the following expenses:

| Expense | Amount |
| --- | --- |
| Advertising | $450 |
| Depreciation | 3,021 |

---

[3]The record is unclear, but it appears that renters began staying at the house in October 2010.

[*13]

| | |
|---|---:|
| Office | 250 |
| Repairs/maintenance | 2,700 |
| Supplies | 350 |
| Utilities | 3,500 |
| Other | 1,815 |

Petitioner asserts, with no written substantiation, that he incurred $1,400 in floor repairs and $2,368 in landscaping expenses. Petitioner also asserts (but again with no written substantiation) that he recarpeted the bedrooms and installed a $24,000 air conditioning system in 2010.

For 2011 petitioner reported $34,013 in gross income on B&E Enterprises' Schedule C. The following table itemizes the expense deductions petitioner claimed and the amounts the IRS allowed for 2011:

| Expense | Claimed amount | Amount allowed |
|---|---|---|
| Advertising | $450 | -0- |
| Contract labor | 7,035 | -0- |
| Depreciation | 3,021 | No adjustment |
| Insurance | 3,748 | $852 |
| Legal/prof'l servs. | 456 | -0- |
| Office | 248 | -0- |
| Repairs/maintenance | 1,286 | -0- |
| Supplies | 727 | -0- |
| Utilities | 3,737 | -0- |
| Other | 3,768 | -0- |

Petitioner did not maintain books and records, nor did he maintain a bank account, for B&E Enterprises. In 2010 petitioner deposited B&E Enterprises'

[*14] rental fees into his personal checking account at Advantage Bank (account number ending in 2682). In 2011 renters paid their rental fees via checks made out to Materials Consultants Associates, another of petitioner's businesses. See infra. Petitioner deposited these checks into Materials Consultants Associates' account at Advantage Bank (account number ending in 4761).[4]

Because B&E Enterprises had no records, Revenue Agent Anderson conducted a bank deposits analysis of B&E Enterprises' finances. She applied the same methodology as she used with respect to ABS' accounts to determine total taxable deposits. Revenue Agent Anderson identified $2,129 in nontaxable deposits (e.g., refunds and loan repayments) and nontaxable payments made to petitioner by his daughter totaling $1,700. Revenue Agent Anderson determined that B&E Enterprises had total taxable income of $55,404 for 2011. After subtracting B&E Enterprises' reported gross income of $34,103, as well as a $1,750 tax refund received in 2011 and deposited into the bank account used by B&E Enterprises, Revenue Agent Anderson determined B&E Enterprises had

---

[4]As will be seen infra, Materials Consultants Associates reported no income on its 2011 Schedule C. All of the taxable amounts deposited into Materials Consultants Associates' bank account were from B&E Enterprises' rental income.

[*15] unreported income of $19,551 for 2011.[5] Revenue Agent Anderson discussed her conclusions with petitioner, but he failed to provide documentation which would negate her conclusions.

Revenue Agent Anderson determined that petitioner rented his house for fewer than 15 days in 2010. Consequently, respondent concedes B&E Enterprises had no reportable income or loss for 2010.[6] See sec. 280A.

With respect to 2011, Revenue Agent Anderson disallowed all but $852 of the claimed insurance expense deduction. See supra p. 13. At trial, respondent's counsel conceded that petitioner is entitled to the following additional expense deductions with respect to B&E Enterprise for 2011:

| Expense category | Revised amount allowed |
| --- | --- |
| Utilities | $617 |
| Supplies | 104 |
| Repairs/maintenance | 146 |

[5]We note that B&E Enterprises reported on its Schedule C gross income of $34,013. We use respondent's calculation of reported gross income because it benefits petitioner.

[6]At trial, respondent's counsel stated that he does not dispute petitioner's assertion that B&E Enterprises incurred the reported expenses for 2010 in the amounts so reported. Thus, respondent's counsel stated that if petitioner could establish that he satisfied the requirements for an exception to sec. 280A, petitioner would be entitled to deduct all of B&E Enterprises' reported expenses for 2010.

**[*16]**　　Advertising　　　　　　　　　　　　　　　329
　　　　　　　　Contract labor　　　　　　　　　　　　1,145

On brief, respondent conceded that petitioner had established that he had gas and electricity expenses of $2,821 and cable expenses of $570 in 2011. However, because petitioner lived in the mother-in-law apartment, respondent apportioned these expenses between B&E Enterprises' business use and petitioner's personal use with 22.74% of the gas and electricity expenses allocated to business use (by dividing the number of days petitioner rented the house, 83 days, by 365 days).

In his brief respondent's counsel concedes that petitioner may deduct $487 for gas and electricity expenses for 2011. However, our calculation ($2,821 x .2274) indicates that petitioner should be allowed a $642 deduction, and this is the amount we will treat as conceded by respondent.

Respondent concedes, and we agree, that petitioner may deduct $130 with respect to his cable bill for 2011. We therefore treat the $642 of gas and electricity payments and the $130 of cable payments as additional amounts petitioner may deduct for 2011.

3.　　Materials Consultants Associates

As noted supra p. 3, petitioner holds a doctorate in materials science. In 2010 petitioner provided consulting services under the business name Materials

[*17] Consultants Associates.  Petitioner advised clients how materials used in equipment and in structures would interact.

In 2010 petitioner reported $12,449 in gross income on Materials Consultants Associates' Schedule C.  Petitioner also reported the following expenses:

| Expense | Amount |
| --- | --- |
| Advertising | $250 |
| Commissions/fees | 50 |
| Insurance | 2,400 |
| Legal/prof'l servs. | 175 |
| Office | 596 |
| Supplies | 575 |
| Taxes/licenses | 150 |
| Utilities | 1,200 |

In 2011 petitioner reported no gross income on the Schedule C for Materials Consultants Associates.  However, the Schedule C reported the following expenses:

| Expense | Amount |
| --- | --- |
| Office | $525 |
| Supplies | 100 |
| Taxes/licenses | 75 |

Petitioner did not maintain books and records for Materials Consultants Associates.  Consequently, Revenue Agent Anderson conducted a review of

[*18] Materials Consultants Associates' bank accounts and calculated the business' 2010 income to be $12,793. Revenue Agent Anderson confirmed that the business had no consulting income in 2011. Because, as noted supra p. 14, the renters of petitioner's home made their checks payable to Materials Consultants Associates, and petitioner deposited those checks into Materials Consultants Associates' Advantage Bank account with number ending in 4761, Revenue Agent Anderson disregarded such deposits in order to prevent double counting the income.

Because petitioner had no documentation with respect to Materials Consultants Associates' expenses, respondent disallowed all the business' claimed expense deductions. At trial, petitioner presented substantiation for insurance purchased by Materials Consultants Associates in 2010. Because of evidence presented, respondent's counsel concedes petitioner is entitled to deduct $595 for the cost of that insurance.

4. Crossroads Wellness

In January of 2010, petitioner established Crossroads Wellness, LLC, as a combination medical marijuana dispensary, wherein it purchased marijuana for resale to the public, and as a wellness center, which sold "knickknacks", such as rolling paper, pipes and paraphernalia, ointments, and other items. Crossroads

[*19] Wellness had a bank account at Wells Fargo, but it did not keep formal records or books. Although petitioner testified that the business was organized as a single-member LLC, Colorado business registration documents indicate that Ken Stone was also a member.

Crossroads Wellness leased two adjacent units in the Crossroads East strip mall: one space housed the marijuana dispensary; the other housed the wellness center. Crossroads Wellness did not have a written lease agreement for either of the two units.

On Crossroads Wellness' Schedule C for 2010, petitioner reported gross receipts of $92,889, cost of goods sold of $28,035, and gross income of $64,854. As Crossroads Wellness kept no records, Revenue Agent Anderson conducted a bank deposits analysis of the business' finances, relying on the same methodology she used with respect to petitioner's other businesses. She reduced Crossroads Wellness' cost of gods sold from $28,035 to $13,017.

Crossroads Wellness claimed deductions for the following expenses as reported on its Schedule C:

| Expense | Amount |
| --- | --- |
| Advertising | $2,050 |
| Contract labor | 6,593 |
| Insurance | 404 |

[*20]   Legal & prof'l servs.                          10,967
        Office                                          4,148
        Rent                                            7,000
        Repairs                                         6,951
        Supplies                                        2,228
        Taxes/licenses                                    185
        Utilities                                       1,558
        Other                                           4,485

These expenses totaled $46,569.  Consequently, for 2010 the reported net profit of

Crossroads Wellness was $18,285.

Petitioner sold Crossroads Wellness in June of 2010.

Respondent disallowed all of Crossroads Wellness' reported expense

deductions, pursuant to section 280E:

> No deduction or credit shall be allowed for any amount paid or
> incurred during the taxable year in carrying on any trade or business
> if such trade or business (or the activities which comprise such trade
> or business) consists of trafficking in controlled substances (within
> the meaning of schedule I and II of the Controlled Substances Act)
> which is prohibited by such Federal law or the law of any State in
> which such trade or business is conducted.

Marijuana is a schedule I controlled substance under the Controlled Substances

Act.  See 21 C.F.R. sec. 1308.11 (2016).  As an alternative reason for disallowing

the claimed deductions, respondent asserts petitioner did not substantiate any of

the expenses.

[*21] At trial petitioner claimed that $50,000 of Crossroads Wellness' reported gross receipts of $92,889 was, in fact, proceeds from the sale of the company. Therefore, petitioner asserts $50,000 should be taxed as a capital gain, rather than as ordinary income. Petitioner did not report the $50,000 capital gain on his 2010 Form 1040; nor did he provide any information regarding his basis in the business. Petitioner further maintains the remaining $42,889 of the reported gross receipts was incorrect in that he overstated the business' income. Petitioner could not state or estimate the correct amount for the company's gross receipts for 2010.

5. Other Unreported Income

As part of her bank deposits analysis, Revenue Agent Anderson examined accounts petitioner had at Charles Schwab and at U.S. Bank. Revenue Agent Anderson determined that petitioner failed to report nonbusiness income of $7,444 for 2010 and $5,411 for 2011.

[*22] 6.     New Amsterdam, LLC, Capital Loss

At trial[7] petitioner asserted he was entitled to, but failed to claim, a $50,000 capital loss arising from the bankruptcy of New Amsterdam, LLC (New Amsterdam).[8] Facts giving rise to the alleged $50,000 capital loss follow.

Petitioner had a business relationship with Mark Young, a land developer whom petitioner had been a friend of for 25 years. Mr. Young was the manager of New Amsterdam, a limited liability company organized to acquire real estate. New Amsterdam purchased a building in Boulder, Colorado, in October of 2006 for approximately $2 million, of which $1.8 million was financed through Key Bank. The building had been an theater near the university. The building was to be renovated in order to provide retail space on the first floor and student housing on the upper levels. However, the economy soured, the planned renovations ceased to be economically viable, and New Amsterdam filed for bankruptcy. The company's Modified Second Amended Plan of Reorganization and Information Pursuant to 11 U.S.C. Sec. 1125(f)(1) was filed with the U.S. Bankruptcy Court

---

[7]Although petitioner raises this issue for the first time at trial, we address it because its raising did not result in surprise and prejudice to respondent.

[8]We are mindful that petitioner claimed $10,518 as a long-term capital loss carryover on his 2010 tax return. Respondent proposed no adjustments with respect to this carryover.

**[*23]** for the District of Colorado on March 23, 2009. Article IX of the

reorganization plan listed the members of New Amsterdam as follows:[9]

| Member | Membership interest (percent) |
|---|---|
| Mark Young | 67.5 |
| Housing Connection, LLC | 6.5 |
| Timothy Dolan | 2.5 |
| Phoebe Dolan | 2.5 |
| Lydia Dolan | 2.5 |
| Andrew Dolan | 2.5 |
| | |
| The Pamela Sarber Drumhiller Trust | 13 |
| Brian and Megan McCarthy | 3.25 |

Mr. Young testified at trial; he was unable to explain why petitioner was not

listed as a member of New Amsterdam in the reorganization plan. Nonetheless,

Mr. Young insisted petitioner held a membership interest in New Amsterdam,

claiming petitioner gave him $50,000 to invest in New Amsterdam. Petitioner

introduced documentation to support Mr. Young's assertion: (1) a $15,000 check

made out to 1727 15th Street, LLC, and (2) a Charles Schwab account statement

which shows that a wire transfer of $32,000 had been made on October 19, 2006

(the statement does not reveal to whom the transfer was made). Mr. Young

---

[9]We are mindful that the membership interests listed in article IX total 100.25%, probably because of rounding.

[*24] testified that the $15,000 check was earnest money for a different real estate investment which fell through and that the $15,000 was transferred to New Amsterdam. No other documentation was provided to memorialize the investment. Moreover, no evidence was presented to indicate whether petitioner retained his putative membership interest in New Amsterdam or abandoned it.

OPINION

1. Introduction

The legal issues raised for all of the adjustments are similar. We therefore review the legal principles involved before applying them to the specific facts regarding each adjustment.

A. Unreported Income

One of the bedrock principles of tax law is that "gross income means all income from whatever source derived". Sec. 61(a); Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1995). The Supreme Court has repeatedly emphasized the "'sweeping scope of this section [i.e., section 61]' and its statutory predecessors." Commissioner v. Schleier, 515 U.S. 323, 327 (1995).

Section 6001 requires taxpayers to maintain sufficient records to allow the IRS to determine their correct tax liability. In the absence of adequate books and records, section 446(b) confers broad powers on the Secretary and his delegate, i.e.

[*25] the Commissioner, to compute the taxable income of a taxpayer. See Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner may use indirect methods to reconstruct income, Holland v. United States, 348 U.S. 121 (1954) (net worth method of reconstructing income valid), and the Commissioner's reconstruction need only be reasonable in the light of all the surrounding facts and circumstances, Petzoldt v. Commissioner, 92 T.C. at 687.

Revenue Agent Anderson reconstructed petitioner's income using the bank deposits method. A bank deposit is prima facie evidence of income and the Commissioner need not prove a likely source of that income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977). We have often accepted this method of income reconstruction in the absence of adequate books and records. See Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), aff'g T.C. Memo. 1967-67; Clayton v. Commissioner, 102 T.C. 632, 645 (1994). The bank deposits method assumes that all money deposited into one's bank account during a given period constitutes taxable income, but the Commissioner must take into account any nontaxable source or deductible expense of which he has knowledge. Clayton v. Commissioner, 102 T.C. at 645-646; DiLeo v. Commissioner, 96 T.C.

**[\*26]** 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). The bank deposits method is not invalidated even if the Commissioner's calculations are not completely correct. DiLeo v. Commissioner, 96 T.C. at 868.

Once the Commissioner reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the Commissioner's use of the bank deposits method is unfair or inaccurate.[10] See Clayton v. Commissioner, 102 T.C. at 645. Taxpayers may do so, in whole or in part, by proving that a deposit is not taxable. See id.

B.      Unsubstantiated Expense Deductions

Deductions are a matter of legislative grace, and the taxpayer bears the burden of clearly showing the right to the claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111 (1933); see Rule 142(a).[11] As with reporting income, taxpayers are required to maintain

---

[10]As we observed supra note 2, respondent seeks to increase ABS' unreported gross receipts for 2011 by $3,354 over the amount determined in the notice of deficiency. In general, Rule 142(a) provides that respondent has the burden of proof with respect to new matters he raises. At trial, Revenue Officer Anderson credibly testified that the increase in ABS' gross receipts was merely the correction of a mathematical error. We therefore find that respondent has met his burden of proof with respect to this issue.

[11]In certain circumstances, sec. 7491(a) provides that the burden of proof with respect to factual matters may shift to the Commissioner. Petitioner does not

(continued...)

[*27] sufficient books and records to substantiate their claimed deductions. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Section 162(a) entitles a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Under that section, an expenditure is deductible if it is (1) paid (by a cash method taxpayer) or incurred (by an accrual method taxpayer) during the taxable year; (2) for carrying on a trade or business; (3) an expense; (4) a necessary expense; and (5) an ordinary expense. Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). No deduction is allowed for personal, living, and family expenses. Sec. 262.

In certain circumstances, if a taxpayer establishes entitlement to a deduction, but not the amount thereof, the Court may estimate the amount allowable, Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), if the taxpayer provides some rational basis on which an estimate may be made, Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In such an instance, the Court's

---

[11](...continued)
argue that sec. 7491(a) applies herein, nor does he show that he meets its requirements to shift the burden of proof. Consequently, the burden of proof remains with petitioner.

[*28] approximation bears heavily against the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner, 39 F.2d at 543-544.

The Cohan rule is inapplicable to expenses governed by the strict substantiation requirements of section 274. Section 274(d) provides that no deduction or credit shall be allowed for, inter alia, any traveling expense or entertainment expense, or any expense related to listed property as defined in section 280F(d)(4),[12] unless the taxpayer substantiates through adequate records or sufficient evidence corroborating his own statement the amount of the expense, the time and place of the expense, and the business purpose of the expense. A taxpayer satisfies the "adequate records" test if he/she maintains an account book, a diary, a log, a statement of expense, trip sheets, or similar records prepared at or near the time of incurring the expenditure and documentary evidence of certain expenditures, such as receipts or bills, that show each element of each expenditure or use. See sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). In the absence of adequate records to establish each element of an expense under section 274(d), a taxpayer may alternatively establish each element: "(A) By his own statement, whether written or oral, containing

---

[12]Listed property includes passenger automobiles, any other property used as a means of transportation, and property generally used for purposes of entertainment, recreation, or amusement.

[*29] specific information in detail as to such element; and (B) By other corroborative evidence sufficient to establish such element." Id. subpara. (3)(i), 50 Fed. Reg. 46020. The taxpayer is not allowed a deduction or credit on the basis of approximations or unsupported testimony. Id. para (a), 50 Fed. Reg. 46014.

2. All Boards Sports

A. Unreported Income

Respondent determined that ABS had unreported income for both 2010 and 2011. During her examination, Revenue Agent Anderson discovered that petitioner's QuickBooks records used the accrual method of accounting even though ABS was a cash method taxpayer. This made petitioner's records unreliable. Upon summoning petitioner's bank records, the revenue agent found that the QuickBooks records were incomplete. Revenue Agent Anderson was therefore justified in reconstructing petitioner's income through the bank deposits method, and petitioner's failure to provide precise records weakens petitioner's critique of the revenue agent's methods. See Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir. 1968), aff'g T.C. Memo. 1966-81.

As discussed supra p. 8, Revenue Agent Anderson totaled the deposits made to the relevant Advantage Bank accounts and payments received through PayPal. She reduced the total deposits by identified nontaxable deposits, such as returned

**[\*30]** checks and interaccount transfers, as well as by identified State and city sales taxes paid. She then discussed her calculations with petitioner and modified her calculations in accordance with his comments.

At trial petitioner asserted that Revenue Agent Anderson double counted some deposits and included transfers from one account to another. However, he was unable to point to any specific instance to prove his assertion of these would-be errors. Petitioner also asserted that the bank deposits included amounts representing the repayment of loans he had made to his daughters. Specifically, petitioner asserts that one of his daughters repaid him $7,500 in cash and another daughter repaid him $3,750. Thus, petitioner asserts, his income was overstated by $11,250. Petitioner did not identify any deposit as coming from the asserted loan repayments. Moreover, Revenue Agent Anderson had specifically asked petitioner whether any of the deposits could have come from nontaxable sources and petitioner did not identify any deposit as a loan repayment from one of his daughters.

On brief, petitioner asserted that Revenue Agent Anderson's analysis was inaccurate in that her final calculation was substantially different from her initial estimates, and that the error in the notice of deficiency (which was subsequently

**[*31]** corrected, see supra note 2) invalidates the revenue agent's analysis.[13]  We reject petitioner's assertion.  Revenue Agent Anderson's initial estimate reflected all of petitioner's bank deposits, and at the time of her examination Revenue Agent Anderson did not have the requisite information to identify nontaxable deposits.  Revenue Agent Anderson subsequently reduced the amount initially determined to be taxable, as a result of consultation with petitioner.  With respect to the error in the notice of deficiency, we are satisfied that it was a mathematical error that was properly corrected by respondent.

In sum, we find that respondent has adequately established the correctness of the revised underreported income amounts for 2010 and 2011.  We therefore hold that petitioner has failed to meet his burden of establishing that respondent's use of the bank deposits method was unfair or inaccurate.

B.    Deducted Expenses

As stated supra, deductions are a matter of legislative grace, and it is the responsibility of the taxpayer to establish entitlement to those claimed deductions.  Respondent disallowed deductions for some of ABS' reported expenses.  At trial and on brief petitioner failed to address the following adjustments made by

---

[13]Petitioner also accuses Revenue Agent Anderson of perjury; we decline to entertain that argument.

[*32] respondent:  contract labor costs; depreciation of petitioner's personal automobile, a 2008 Audi; insurance costs; legal and professional service fees; travel expenses; and meals expenses.  We therefore deem these issues conceded by petitioner.  However, petitioner did address a number of ABS' other expenses at trial, and we now turn to these.

(i)    Advertising

Respondent disallowed $445 of ABS' claimed 2010 advertising expenses, thus allowing advertising expenses of $976.  No adjustment was made to ABS' 2011 expenses.  At trial petitioner introduced evidence with respect to one advertising transaction:  an agreement, dated April 27, 2010, with bestofmytown.net regarding a yearlong agreement to place an ad on that Web site for $499, payable in quarterly installments of $125.  Petitioner asserts that the $499 represents a portion of the disallowed amount for 2010.  However, petitioner provided no evidence that any part of the $499 was paid during 2010.  Moreover, petitioner failed to establish that the bestofmytown.net expenses were not included in the $976 of advertising expenses allowed by respondent.

(ii)    Car and Truck

Respondent disallowed deductions for all of ABS' 2010 and 2011 reported car and truck expenses.  These expenses are subject to the strict substantiation

**[\*33]** requirements of section 274(d).  The taxpayer may elect to claim either vehicle expenses based on the actual expenses incurred or to use a standard mileage rate as provided in section 1.274-5(j)(2), Income Tax Regs.

Petitioner asserts he used his personal car for business purposes.  He did not keep a contemporaneous log regarding his car use.  Rather, he used his cellular telephone's calendar feature to track his business travels.  After audit, petitioner used the calendar feature to generate a reconstructed travel log detailing his 2010 and 2011 car use.  However, petitioner testified that his phone was stolen shortly after he completed the log.

Petitioner submitted into evidence gasoline receipts and car repair invoices to document his actual car expenses.  A taxpayer cannot use the standard mileage rate and claim actual expenses for the same year.  See Kay v. Commissioner, T.C. Memo. 2002-197, aff'd, 85 F. App'x 362 (5th Cir. 2003).  Petitioner has not indicated which method he wishes to use to deduct his car expenses, but, in any event, his receipts are unreliable inasmuch as (1) they do not differentiate between personal and business expenses and (2) petitioner did not provide any evidence regarding the proportion of personal use vis-a-vis business use of his car.

Turning to the standard mileage rate, petitioner's reconstructed mileage log was not prepared at or near the time of incurring the car expenses, and the calendar

[*34] that petitioner kept contemporaneously was lost. Moreover, the log indicates that petitioner was unrealistically busy. For example, on January 5, 2010, petitioner claims he drove 64 miles to pick up products at Never Summer Industries in Denver, Colorado, then drove 64 miles to attend the Rocky Mountain Preview Show in Denver, Colorado, and then drove 50 miles to Eldora, Colorado, to test products. Petitioner recorded a similar trip 2011: attending the Rocky Mountain Preview Show and testing products in Eldora on January 5, 2011. We are skeptical that petitioner would have driven 178 miles on a day where he participated in a trade show, which would consume a substantial portion of the day, and where he tested his products at a ski resort, which would have consumed a similarly large portion of the day. And all of this while he was managing his other businesses. Additionally, the credibility of petitioner's testimony is suspect in that he testified he broke his leg on January 1, 2011, yet claims to have tested his boards just four days later. In sum, petitioner's reconstructed mileage logs are not reliable. The reconstructed mileage logs do not meet the requirements of section 1.274-5T(c)(3)(i), Temporary Income Tax Regs., supra.

        (iii)   Interest

Respondent disallowed deductions for all of ABS' claimed interest expenses for 2010 and 2011. The expenses reflect interest accrued on petitioner's credit

[*35] cards, which he used for both personal and business purchases. At trial, petitioner introduced yearend statement pages with respect to his Chase and WorldPoints credit cards for 2010 and 2011 that indicate total interest charges of $3,297 in 2010 and $2,711 in 2011.

Petitioner testified that 97% of the interest charges were for business purchases, but he presented no documentation to substantiate his testimony. Petitioner submitted into evidence copies of his 2008 WorldPoints statements, but we cannot determine from these statements the demarcation between personal and business expenses. Moreover, the statements do not substantiate petitioner's 2010 and 2011 business expenses.

(iv)  Repairs and Supplies

Respondent allowed deductions for repair expenses of $1,000 for 2010 and $1,974 for 2011. Respondent disallowed all of ABS' claimed supply expense deductions for 2010 and 2011. At trial, petitioner submitted, as a single, disorganized exhibit, numerous receipts to substantiate all of ABS' claimed repair and supply expense deductions. We review these two issues together.

Respondent was not provided these receipts before trial. After trial respondent's counsel reviewed ABS' receipts. Respondent's counsel identified approximately $475 of hardware receipts that could reasonably be related to ABS'

[*36] 2010 reported repair expenses. However, respondent had previously allowed ABS to deduct $1,000 in repair expenses; therefore, respondent did not allow any additional amount of repair expense deductions.

Respondent identified approximately $171 of receipts that would reasonably be associated with ABS' 2010 supply expenses. For 2011 respondent was unable to identify any receipts that could reasonably be related to ABS' repair expenses. However, respondent did identify approximately $234 of allowable supply expenses.

We have conducted our own review of petitioner's receipts. Initially, we note that a number of the receipts relate to automobile expenses, and we do not consider them here. With respect to the remaining receipts, several relate to purchases for petitioner's home, such as gardening supplies and plumbing supplies. Still others merely list codes and abbreviations which we are unable to interpret. We are unable even to estimate ABS' expenses under the Cohan doctrine. We therefore hold the claimed deductions for ABS' repair and supply expenses in excess of the amounts allowed by respondent are not allowable.

      (v)    Rent

Respondent allowed $17,787 of the claimed $24,600 deduction for ABS' 2010 rent expense and $16,830 of the claimed $18,000 deduction for ABS'

[*37] claimed 2011 rent expense. At trial, ABS' landlord, Theresa Silverly, testified that ABS paid rent of $28,305 in 2010 and $18,352. in 2011. Ms. Silverly's testimony was credible.

We are mindful that there was a discrepancy between Ms. Silverly's testimony that petitioner paid her rent in 2010 in excess of $28,000, while petitioner deducted $24,600. But we are also mindful that petitioner did not keep accurate records. We accept Ms. Silverly's testimony in this regard. We therefore find the rent paid by ABS to be $28,305 in 2010 and $18,352 in 2011.

(vi)    Taxes and Licenses

Respondent disallowed all of ABS' claimed taxes and licenses expenses for the years at issue. At trial petitioner submitted a number of Federal Express invoices that included line items for "Duties, Tax, Customs, Other Fees" in support of the claimed deductions. Only one of the invoices indicates that ABS made a payment to Federal Express (specifically, invoice No. 5-838-70439, dated December 2, 2010, for $109). Respondent's counsel concedes a deduction for this amount. None of the remaining invoices indicates payment, and two of them (invoice No. 5-868-52137, dated February 10, 2011, and invoice No. 5-894-23853, dated April 11, 2011) are marked "past due". We hold that petitioner may deduct taxes and licenses of $109, as conceded by respondent's counsel.

**[*38]**     (vii)  <u>Utilities</u>

Respondent disallowed all of ABS' claimed utility expense deductions. Ms. Silverly testified that ABS' lease with Crossroads East was a triple net lease, i.e., the business' rental payments included incidental expenses such as utilities and snow removal. At trial petitioner presented invoices from Comcast for triple-play services (i.e., its television/Internet/telephone bundle), substantiating payments in 2011 totaling $1,350. Respondent's counsel concedes ABS' payments to Comcast. We thus hold that petitioner may deduct utility expense of $1,350, as conceded by respondent.

(viii)  <u>Other Expenses</u>

Respondent reduced petitioner's claimed ABS "other expenses" by $8,323 in 2010 and $1,534 in 2011, respectively. Our review of each category of "other expenses" for which petitioner challenges respondent's determination follows.

(a)     <u>Postage</u>

Respondent allowed postage expense deductions of $7,518 for 2010 and $10,876 for 2011, on the basis of records provided to Revenue Agent Anderson. At trial petitioner introduced Post Office receipts, of which only four, totaling $59, were legible. We cannot determine whether these receipts are for additional postage which was not recorded or included in the records provided to Revenue

**[*39]** Agent Anderson.  In sum, petitioner has failed to establish that he is entitled to a deduction for postage for either year in an amount greater than that allowed by respondent.

(b)     Bank Charges

Respondent disallowed deductions for ABS' claimed bank charge expenses. Petitioner provided no documentation regarding these claimed expense deductions; thus he failed to establish that he is entitled to deductions for these amounts.

(c)     Dues and Subscriptions

Petitioner purchased annual passes to several ski resorts to test and market his products.  Petitioner claims he had unlimited free access to other ski resorts for his personal enjoyment.  Thus, petitioner claims his paid ski passes were exclusively for business purposes.  Respondent disallowed deductions for the costs of ski resort passes.  Petitioner did not explain how he obtained free slope access for his personal enjoyment yet had to pay for passes for business reasons; he produced no witnesses, nor did he introduce any documentation regarding his business relationship with the ski resorts (such as a contract).  Petitioner therefore

[*40] has failed to establish he is entitled to deduct the amounts claimed for annual passes to ski resorts.[14]

(d)     Charitable Contributions

Respondent disallowed all of ABS' claimed deductions for charitable contributions.  Petitioner provided no substantiation with regard to any charitable donations he allegedly made; he has therefore failed to establish that he is entitled to deduct the amounts claimed for charitable contributions.

(e)     Sponsorships

Respondent disallowed all of ABS' claimed sponsorship deductions. Petitioner asserts that ABS sponsored several snowboarders, but he provided no substantiation with regard to any sponsorship payments he allegedly made; he has therefore failed to establish that he is entitled to deduct the amounts claimed for sponsorship of snowboarders.

C.     Recapture of Prior Years' Excess Depreciation

As noted supra pp. 9-10, respondent disallowed ABS' claimed depreciation deductions.  These depreciation deductions related to petitioner's use of his

---

[14]We need not decide whether we may estimate petitioner's ski pass expenses under the Cohan doctrine or whether the expenses are subject to the heightened substantiation requirements of sec. 274(d) inasmuch as we do not have sufficient information to make such an estimate.

[*41] personal automobile, a 2008 Audi, during the years at issue. Petitioner previously deducted $2,632 and $4,331 on his 2008 and 2009 tax returns, respectively, for the use of the Audi in ABS' business. Respondent now seeks to have petitioner recapture the excess depreciation.

A taxpayer may elect to deduct as current expenses the cost of section 179 property acquired and used in the active conduct of a trade or business and placed in service during the year. Sec. 179(a), (b), (d)(1); sec. 1.179-4(a), Income Tax Regs. To be eligible for current expense deductions under section 179, the taxpayer must show that the business use of the property exceeds 50%. Sec. 1.179-1(e)(2), Income Tax Regs.; see also sec. 280F(b)(3) (relating to listed property). But if in any year, the taxpayer's business use of the property falls to 50% or less, deductions previously claimed under section 179 are subject to recapture under section 280F(b)(2) if they are listed property as defined in section 280F(d) or under section 179(d)(10) if they are not listed property. Petitioner's Audi constitutes listed property. Sec. 280F(d)(4)(A)(i), (5). Respondent determined in the notice of deficiency that petitioner's use of the Audi was not predominantly for use in a qualified business in 2010. Therefore he determined that petitioner must recapture excess depreciation claimed for 2008 and 2009.

[*42] Petitioner provided no evidence regarding the proportion of personal use of the Audi vis-a-vis the business use of that car for 2010. His reconstructed mileage log does not state the total miles driven during 2010. Thus, even if we accepted petitioner's mileage log as credible, which we are unable to do, we would be unable to determine whether petitioner met the requirements of section 280F(b)(2).[15] Consequently, petitioner must recapture excess depreciation claimed for 2008 and 2009 with respect to the Audi.

3.    B&E Enterprises

    A.    2010 Tax Year

Respondent disallowed B&E Enterprises' 2010 income and expenses because petitioner failed to prove that his house was rented for 15 or more days. At trial respondent's counsel conceded that if petitioner established that the house was rented for 15 or more days during 2010, B&E Enterprises' expense deductions would be valid.

Section 280A(g) provides that if a dwelling unit is used during the taxable year by the taxpayer as a residence and that dwelling unit "is actually rented for less than 15 days during the taxable year", then (1) no deduction otherwise

---

[15]Petitioner failed to attach a depreciation schedule to his 2010 tax return although he did attach one to his 2011 tax return.

**[*43]** allowable because of the rental use shall be allowable, and (2) the income derived from the rental use is not included in the taxpayer's gross income under section 61. A "dwelling unit" includes a house, apartment, condominium, and all structures or other property appurtenant to the dwelling unit unless the unit is used exclusively as a hotel, motel, or inn. Sec. 280A(f)(1). A dwelling unit is a residence if a taxpayer uses the dwelling unit during the taxable year for personal purposes for a number of days that exceeds the greater of (A) 14 days or (B) 10% of the number of days during the year for which the unit is rented at a fair rental value.

Petitioner lived in the mother-in-law apartment on the property, not the main house.[16] However, in 2010 petitioner's daughter lived half the year in her room in the main house. Providing one's daughter a rent-free place to live constitutes a personal purpose. See sec. 267(c)(4); Loftstrom v. Commissioner, 125 T.C. 271, 277-278 (2005) (taxpayers' daughter's rent-free use of the business portion of a house for a period during the tax year constitutes personal use by the taxpayers). Thus, petitioner's house is a dwelling unit used as a residence.

---

[16]Respondent does not contend that the mother-in-law apartment constitutes a portion of the dwelling unit.

**[*44]** Consequently, petitioner must establish that his house was rented for at least 15 days during 2010.

B&E Enterprises maintained no books, rental contracts, or other records in 2010.  At trial petitioner stated that he believed he rented rooms in the house "somewhere around 18 or 20 days."  B&E Enterprises reported gross income of $8,450 on its 2010 Schedule C.  Petitioner asserts that he charged guests an average of $500 per night, which would result in about 17 days of rentals.  Petitioner provided no documentation to corroborate this assertion.

In reviewing petitioner's bank records, Revenue Agent Anderson identified several checks used as payment for rental of the house.  Her examination revealed that petitioner charged guests an average of $600 per night, which, on the basis of B&E Enterprises' gross income of $8,450, would indicate that the house was rented about 14 days during 2010.

Evidence regarding this issue is scanty at best.  Petitioner failed to tally the number of days he rented the house; he presented no checks, receipts, or any documentation whatsoever to establish when he rented the house and at what price.  The evidence presented by respondent indicates that B&E Enterprises charged a higher rent than petitioner asserts, a rental price that would cause B&E Enterprises to fail to meet the requirements of section 280A(g).  As petitioner has

**[\*45]** the burden of proof, we hold that the income derived from the house in 2010 is not includible in petitioner's gross income, nor are the deductions petitioner claimed allowable.

### B. 2011 Tax Year

#### (i) Unreported Income

Respondent determined that B&E Enterprises had unreported income for 2011. As B&E Enterprises failed to keep books and records during 2011, we find Revenue Agent Anderson was justified in summoning petitioner's bank statements to conduct a bank deposits analysis to reconstruct the business' income. Moreover, we note that petitioner's failure to provide records weakens his critiques of Revenue Agent Anderson's determinations. The revenue agent's methodology was similar to the one she used in examining ABS' bank accounts; she met with petitioner to discuss her findings and hear his explanations. Neither at trial nor on brief did petitioner raise any factual or legal issue to challenge Revenue Agent Anderson's analysis. Having heard Revenue Agent's Anderson's testimony and observed her when she was testifying, and upon review of her documentation, we are satisfied that Revenue Agent Anderson's use of the bank deposits method was appropriate and her calculations were accurate.

**[*46]**     (ii)     Deducted Expenses

Respondent disallowed most of B&E Enterprises' claimed expense deductions. At trial petitioner failed to address the following adjustments made by respondent: office expenses; legal and professional service fees; and the partially disallowed insurance expenses. We deem these issues conceded by petitioner. At trial, petitioner presented evidence substantiating some of the claimed deductions, and respondent's counsel conceded those expenses. See supra pp. 15-16. Those expenses are: supplies, repairs and maintenance, advertising, and contract labor. We have reviewed petitioner's receipts entered into evidence. Several of them relate to purchases in years other than those in issue; some are illegible; and others are duplicates. We do not find these receipts support petitioner's contention that he is entitled to deduct expenses in excess of those conceded by respondent's counsel.

Petitioner claimed a deduction for utility expenses incurred in maintaining the house in 2011. Respondent initially disallowed any deduction for utility expenses, but at trial petitioner provided sufficient documentation for respondent to allow a deduction for $617 in utility expenses. On brief, respondent conceded that petitioner could deduct gas and electricity expenses, which we recalculated to

[*47] be $642, and cable expenses of $130. These appear to be additional to the $617 already conceded by respondent.

The allocation used by respondent (i.e., 22.74% for business use) is only an estimate. However, under the Cohan doctrine, in instances where a taxpayer establishes entitlement to a deduction, but does not establish the amount thereof, we may estimate the deduction if the taxpayer provides some rational basis on which the estimate may be made, although in doing so, we bear heavily against the taxpayer whose inexactitude is of his own making. Petitioner has not provided any rational basis upon which we may estimate the amounts of the utility expenses which represent business expenses and those which are for petitioner's personal use. On the other hand, respondent has put forward a reasonable allocation method to allow us to estimate the correct expense deduction, and we adopt respondent's method.

4.    Materials Consultants Associates

   A.    2010 Tax Year

      (i)    Unreported Income

Because Materials Consultants Associates failed to keep books and records, we find Revenue Agent Anderson was justified in using the bank deposits method to reconstruct the company's income. The revenue agent's methodology was

[*48] similar to that used in examining both ABS' and B&E Enterprises' bank accounts. Neither at trial nor on brief did petitioner raise any factual or legal issue to challenge Revenue Agent Anderson's analysis. Having heard her testimony and reviewed the evidence presented, we are satisfied that Revenue Agent Anderson's use of the bank deposits method was appropriate and conclude it accurately reflected the omission of Materials Consultants Associates' unreported income for 2010.

(ii)     Deducted Expenses

Respondent disallowed all of Materials Consultants Associates' 2010 expense deductions for lack of substantiation. At trial petitioner submitted into evidence (1) a cancellation notice/past-due invoice for an unpaid insurance premium of $350 and (2) a check paid to The Hartford for insurance of $595. As a result of this documentation, respondent's counsel now concedes that petitioner may deduct $595 in insurance payments for 2010. Respondent argues, and we agree, that the past-due invoice gives no indication that petitioner paid the insurance premium. Petitioner provided no other substantiation. Thus, we find petitioner has failed to establish his entitlement to deduct any other expense with respect to Materials Consultants Associates' 2010 tax year.

[*49] B.     2011 Tax Year

Materials Consultants Associates had no income in 2011.  Respondent disallowed all of the business' claimed expense deductions for 2011.  Petitioner provided no substantiation for any of Materials Consultants Associates' reported expenses for the year.  We therefore find that petitioner has failed to meet his burden in establishing his entitlement to the claimed expense deductions.

5.     Crossroads Wellness

Because Crossroads Wellness had no books and records, Revenue Agent Anderson was required to conduct a bank deposits analysis.  The revenue agent's methodology was similar to that used in determining the underreported income for petitioner's other business entities.  We believe her methodology was fair and accurate.

A.     Gross Receipts

Revenue Agent Anderson confirmed that Crossroads Wellness' 2010 gross receipts were $92,889, as reported on Schedule C.  At trial petitioner claimed that the $92,889 reported as gross receipts was inaccurate.  He asserts that (1) the $92,889 included $50,000[17] which he received from the sale of the business, which

---

[17]In his posttrial answering brief, petitioner alludes to a $60,000 sale price for Crossroads Wellness.

[*50] should be taxed at the preferential capital gains rate and (2) the remaining $42,889 was overstated. These are new issues to which respondent made no objection. We thus treat them as if they were properly pleaded. See Rule 41(b). Petitioner provided no support for his assertion that the $92,889 he reported on his tax return was incorrect.

We accept petitioner's assertion that he sold his business in 2010. Petitioner testified he received a Form 1099 documenting that he sold his business for $50,000, but the alleged Form 1099 was not submitted into evidence. We are skeptical as to the amount petitioner claims he received from the sale of his business, for if he had received $50,000 (or $60,000), the proceeds would have been reflected in Revenue Agent Anderson's bank deposits analysis. Further, we are mindful that it was Revenue Agent Anderson's practice to discuss all her conclusions with petitioner.

Petitioner provided no documentation regarding his basis in Crossroads Wellness. Because we do not know the sale price nor petitioner's basis in the business, we cannot determine the amount of petitioner's gain, if any, from the sale.

With respect to petitioner's remaining contention that the gross receipts were overstated, petitioner provided no documentation to support his assertion.

[*51] And, as noted supra, Revenue Agent Anderson confirmed that Crossroads Wellness' gross receipts were $92,889, the same amount petitioner reported on Crossroads Wellness' 2010 Schedule C.

B.     Cost of Goods Sold

As a result of her bank deposits analysis, Revenue Agent Anderson reduced Crossroads Wellness' cost of goods sold from $28,035 to $13,017. Cost of goods sold is subtracted from gross receipts in computing gross income. Sec. 1.61-3(a), Income Tax Regs. Cost of goods sold is not an expense deduction under section 162. See Max Sobel Wholesale Liquors v. Commissioner, 69 T.C. 477 (1977), aff'd, 630 F.2d 670 (9th Cir. 1980); sec. 1.162-1(a), Income Tax Regs.

A taxpayer must retain records sufficient to substantiate the claimed cost of goods sold. Sec. 6001; Newman v. Commissioner, T.C. Memo. 2000-345. Crossroads Wellness' cost of goods sold was for the marijuana the business purchased from growers to resell to customers. Because the company maintained no books or records, Revenue Agent Anderson determined the business' cost of goods sold by reviewing all checks written from the Wells Fargo account associated with Crossroads Wellness that were identifiable as marijuana purchases, i.e., checks that could be determined to have been made out to an identifiable marijuana vendor. Petitioner informed Revenue Agent Anderson that

**[*52]** he purchased a substantial part of his inventory in cash, but he failed to provide her with any documentation to substantiate his claimed cash purchases. As a result, Revenue Agent Anderson was unable to consider any cash purchases as part of her calculation. At trial petitioner submitted into evidence a series of documents purporting to support the amount he determined to be Crossroads Wellness' cost of goods sold. These documents consist of (1) a handwritten summary by petitioner listing amounts of marijuana purchased by the business and (2) Revenue Agent Anderson's workpapers. Most of the entries on petitioner's list do not include dates of purchase, making it impossible for us to determine whether these purchases duplicate those identified by Revenue Agent Anderson through the bank deposits analysis. Other entries included purchase dates, but they do not state the purchase price for the marijuana. And there are entries which included neither dates of purchase nor purchase amounts. Thus, the only substantiation available is the checks which respondent took into account. We therefore hold that petitioner is entitled to cost of goods sold for 2010 only in the amount respondent determined.

C.    Expense Deductions

Respondent disallowed all of Crossroads Wellness' expense deductions for 2010. Petitioner produced Crossroads Wellness' Wells Fargo bank records at trial

[*53] but provided no other documentation regarding the business' expenses. The canceled checks included in the Wells Fargo account records do not, by themselves, substantiate the company's expenses. It is not clear for what purpose the checks were written. For example, we are unable to determine the business purpose of a check to Glacier Ice Cream, dated February 11, 2010, for $300, or for a check to Kaller Ford, dated February 19, 2010, for $137. Under the Cohan doctrine, we may not simply assume the purpose of the payments. We therefore find that petitioner has failed to substantiate Crossroads Wellness' reported expenses.

6.      Other Unreported Income

As part of her bank deposits analysis, Revenue Agent Anderson examined petitioner's Charles Schwab accounts and his U.S. Bank account. The revenue agent calculated that petitioner failed to report nonbusiness income of $7,444 for 2010 and $5,411 for 2011 that were deposited into these accounts. Petitioner has failed to contest the revenue agent's calculations or identify any error she made. We therefore hold that petitioner has failed to meet his burden of establishing that respondent's use of the bank deposits method was unfair or inaccurate.

[*54] 7.    New Amsterdam, LLC Capital Loss

In his petition, petitioner asserted that he is entitled to deduct a $50,000 long-term capital loss arising from a 2006 investment in New Amsterdam. Petitioner failed to specify the Code section under which he claims this loss deduction.  However, we assume petitioner claims this loss pursuant to the provisions of section 165(a) and therefore analyze petitioner's claim on that basis.

Section 165(a) provides a deduction for any loss sustained during the taxable year not compensated for by insurance or otherwise.  Under section 165(c), losses for an individual are limited to (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit though not connected with a trade or business; and (3) losses of property not connected with a trade or business or a transaction entered into for profit if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.  Losses under section 165 may be either ordinary or capital.  La Rue v. Commissioner, 90 T.C. 465, 482-483 (1988).  To claim a loss deduction under section 165 for abandonment, petitioner must establish (1) he had an ownership interest and (2) that he abandoned that interest.  See Milton v. Commissioner, T.C. Memo. 2009-246.

**[*55]** A.     <u>Petitioner's Failure To Establish an Ownership Interest</u>

Petitioner asserts that he had a partnership interest in New Amsterdam, and that consequently upon the collapse of that partnership in bankruptcy, he sustained a capital loss under section 1222. Petitioner presented no evidence to substantiate his asserted partnership interest. No copy of the partnership agreement was entered into evidence. New Amsterdam's bankruptcy filings were introduced into evidence, but petitioner was not listed as a partner in the bankruptcy documents. Mark Young, the managing partner of New Amsterdam, testified that petitioner was a partner in New Amsterdam, but he was unable to explain why petitioner was not listed as a partner in the bankruptcy documents.

Petitioner acknowledged that he never received a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., from New Amsterdam; and while the bankruptcy filings stated that the partnership's other partners received income distributions in prior tax years,[18] there is no indication that petitioner ever received a distribution. Again, Mr. Young was unable to explain this discrepancy. Mr. Young speculated that he might have held petitioner's interest as a nominee, but he was not certain.

---

[18]The New Amsterdam balance sheet as of February 28, 2009, was attached as exhibit B of the Modified Second Amended Plan of Reorganization and Information Pursuant to Title 11 U.S.C. sec. 1125(f)(1).

[*56] Petitioner testified he gave $50,000 to Mr. Young and introduced (1) a $15,000 check made out to 1727 15th Street, LLC, and (2) a Charles Schwab account statement which shows that a wire transfer of $32,000 was made on October 19, 2006, the same month as New Amsterdam's purchase of the building. Mr. Young testified that when the 1727 15th Street venture failed he transferred the $15,000 he received from petitioner to New Amsterdam. Mr. Young also testified that he received the wire transfer and that the $32,000 "probably went to the title company." However, no documentation was presented to establish that the $15,000 was transferred to New Amsterdam, and the Charles Schwab account statement makes no mention of the recipient of the wire transfer. Even were we to presume that the $15,000 check and the $32,000 wire transfer were for investment in New Amsterdam, they do not substantiate an ownership interest. See Milton v. Commissioner, T.C. Memo. 2009-246.

In Milton, we held that a $90,000 check was not sufficient evidence to establish that the taxpayer's S corporation purchased a partnership interest for which she was claiming a capital loss. The taxpayer failed to provide any documentation regarding the acquisition of the partnership interest.[19] We

---

[19]We also note that $3,000 remains unaccounted for regarding petitioner's putative investment.

**[*57]** therefore find petitioner did not establish that he owned an interest in New Amsterdam.

> B.     Petitioner's Failure To Establish Abandonment

To be entitled to deduct an abandonment loss under section 165, a taxpayer must show: (1) an intention on the part of the owner to abandon the asset and (2) an affirmative act of abandonment. United States v. S.S. White Dental Mfg. Co., 274 U.S. 398 (1927); Citron v. Commissioner, 97 T.C. 200, 208-209 (1991). Section 1.165-1(b), Income Tax Regs., provides that for a loss to be allowable under section 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165-11, relating to disaster losses [inapplicable here], actually sustained during the taxable year." Petitioner has not provided any evidence, documentary or otherwise, to establish that he intended to end his relationship with New Amsterdam. Petitioner asserts that even though he was ill in 2010, he was in continual communication with Mr. Young during the year. Mr. Young, however did not indicate that petitioner told him that he was interested in abandoning whatever business relationship the two of them might have had. We therefore find that petitioner did not take sufficiently identifiable steps to abandon an interest in New Amsterdam to be entitled to an abandonment loss deduction.

**[*58]** C.     Conclusion

Petitioner failed to establish that he had an ownership interest in New Amsterdam and that he abandoned that interest.  In the face of documentation showing that he was not listed as a partner in the enterprise, petitioner could only call upon the testimony of Mr. Young.  We carefully observed Mr. Young while he was testifying; his testimony was not credible.  For instance, when confronted with the fact that New Amsterdam's bankruptcy filings did not list petitioner as a partner, Mr. Young had no response.  When pressed as to how he could testify that petitioner was a partner, Mr. Young vaguely stated that perhaps he held petitioner's interest as a nominee, but he would not commit himself to that claim.  Moreover, Mr. Young could not explain why the listed partners received distributions from New Amsterdam, but petitioner did not.  And Mr. Young had no records to substantiate that he transferred $47,000 to New Amsterdam on behalf of petitioner.

We therefore hold that petitioner is not entitled to a long-term capital loss deduction arising from the failure of New Amsterdam.  Moreover, Mr. Young gave no indication that petitioner informed him of an intent to abandon his alleged interest in New Amsterdam.  We therefore hold that petitioner may not deduct a long-term capital loss.

[*59] 8.  <u>Section 6662(a) Accuracy-Related Penalty</u>

Respondent determined that petitioner is liable for an accuracy-related penalty of $8,619 for 2010, and $4,459 for 2011. Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to, inter alia, negligence or disregard of rules or regulations, subsec. (b)(1), or a substantial understatement of income tax, subsec. (b)(2).

Negligence as used in section 6662(b)(1) is defined as any failure to make a reasonable attempt to comply with the Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec 1.6662-3(b)(1), Income Tax Regs. An understatement of income tax is substantial for purposes of section 6662(b)(2) if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the section 6662(a) accuracy-related penalty. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Once the Commissioner has met his burden of production, the taxpayer bears the burden of proving that the penalty is inappropriate, by demonstrating for example, that his/her position was supported by substantial authority under section

**[\*60]** 6662(d)(2)(B)(i) or that he/she had reasonable cause for the underpayment and acted in good faith under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent has met his burden of production with respect to petitioner's negligence in that, among other things, petitioner accounted for ABS' finances using the accrual method of accounting even though ABS operated as a cash method of accounting taxpayer; petitioner failed to keep proper records with respect to any of his other activities; and he failed to substantiate most of his reported expenses.

With respect to petitioner's understatements of income tax, petitioner reported negative taxable income on both his 2010 and 2011 tax returns; thus he had zero tax liabilities for both years. Before trial respondent contended that petitioner's required tax was $43,093 for 2010 and $22,296 for 2011. Since the trial respondent has conceded a number of issues and we determined that ABS paid rent of $28,305 in 2010 and $18,352 in 2011. Thus, the exact amount of petitioner's understatement must await a Rule 155 computation, which we will order. To the extent that computation establishes that petitioner has substantial

[*61] understatements of income tax for the years at issue, respondent will have met his burden of production with regard to the section 6662(b)(2) accuracy-related penalty. See Ashmore v. Commissioner, T.C. Memo. 2016-36.

A taxpayer may avoid liability for the accuracy-related penalty with respect to any portion of an underpayment if the taxpayer demonstrates that he/she had reasonable cause for the underpayment and acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner put forward no evidence that he acted with reasonable cause and in good faith. He consulted no tax professionals in operating his businesses and filing his tax returns. Petitioner testified that he was extremely ill during 2010, but we are mindful that even during his illness petitioner continued to operate his various businesses, including physically exerting himself snowboarding to demonstrate ABS' products. Even were we to accept that petitioner's 2010 illness debilitated him throughout the year, we cannot help but note that petitioner holds a Ph.D. in materials science, is the holder of numerous patents, and, by his own testimony, is well versed in presenting information to others in a logical format. Yet he failed to keep the most basic of records to document his activities during

**[\*62]** the years at issue.  We therefore conclude that petitioner has failed to show he had reasonable cause for, or acted in good faith with respect to, the underpayments.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under</u>

<u>Rule 155</u>.